**The below described is SIGNED.**

(hph)

**Dated: March 06, 2008**

_____
William J. Thurman

**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number:  06-20612 |
| **George Love Farming, LC,** | Chapter 7 |
| Debtor. | |

### MEMORANDUM DECISION ON TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT WITH BARNES BANKING COMPANY

The matter before the Court is the chapter 7 Trustee's Motion to Approve the Settlement Agreement ("Trustee's Motion") between Joel T. Marker, Trustee of the bankruptcy estate of George Love Farming, LC ("the Debtor"), and Barnes Banking Company ("Barnes").  The Court conducted an evidentiary hearing on February 12, 2008, in Salt Lake City.  The parties appeared and presented evidence and oral arguments.  Based upon the same, the pleadings as well as other court papers and submissions, the Court issues the following Memorandum Decision.

## I.    BACKGROUND

On October 12, 2004, Snowville Farms, LLC ("Snowville") and Mr. George Love ("Mr. Love") filed separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On May 15, 2005, the Bankruptcy Court issued an Order Substantively Consolidating the bankruptcy estates of the Debtor, George Love Farming Partnership, Mr. Love and Snowville, into Case No. 04-36559 (the "Consolidated Case"). On December 12, 2005, the Court confirmed the Chapter 11 Joint Plan of Reorganization (the "Joint Plan" or "Plan") for the consolidated estate.[1]

On March 7, 2006, the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (Case No. 06-20612), and thereafter Joel T. Marker was appointed as the Chapter 7 Trustee ("Trustee").

On January 26, 2006, Snowville and Mr. Love (the "Reorganized Debtors") filed a Motion of Reorganized Debtors for Order Authorizing Amendment of Treatment of Barnes and Life Investors Insurance Company of America ("LIICOA"), and for Order Authorizing Short-Term FSA Loan ("FSA Loan Motion") (Docket No. 422 for Consolidated Cstate). The Court denied the FSA Loan Motion on February 23, 2006 (Docket No. 443 for Consolidated Case).

On February 14, 2006, the Reorganized Debtors filed a Joint Motion for Order Enforcing the Debtors' Confirmed Plan of Reorganization ("Plan Enforcement Motion") (Docket No. 434 for Consolidated Case).

---

[1]    Throughout this Memorandum Decision, the Court relies on the docket entries and prior rulings from this case and the Consolidated Case, and to that extent the Court takes judicial notice of those entries and/or rulings. See CA 79-3511 St. Louis Baptist Temple, Inc., 605 F.2d 1169 (10th Cir. 1979) (holding that the court may take judicial notice, whether requested or not, of its own records and files, and facts which are part of its public records. Judicial notice is particularly applicable to the court's own records or prior litigation closely related to the case before it. The doctrine of judicial notice may be used sua sponte).

On March 16, 2006, the Court denied the Plan Enforcement Motion and made the

following findings of fact and conclusions of law on the record ("Findings of Fact Transcript"):

a.  "Under the terms of the plan, Snowville was required to pay Barnes $550,000 by December 30,'05. Snowville was required to pay LIICOA $320,000 by January 20, '06. Snowville commenced making payments to all creditors under the confirmed plan except Barnes and LIICOA. It failed to pay Barnes on December 30 and failed to pay LIICOA on January 20. Snowville was unable to pay Barnes on December 30 from the funds the debtor had on hand. Snowville had significant quantities of stored safflower in bins, cattle, and other crops but had not sold them to generate sufficient funds to pay Barnes by that date."[2]

b.  "Snowville, realizing it could not pay Barnes by that time, approached the FSA which is the Farm Services Agency for a loan to pay Barnes. The FSA required a first lien on crops for the loan. The debtor approached Barnes for a lien waiver on the debtor's crops and Barnes elected not to sign such, claiming that it would be in contravention with the agreement it had with LIICOA. As a result, the debtor was unable to procure the loan from the FSA to pay Barnes by that date."[3]

c.  "Mr. Love admitted that even if LIICOA and Barnes had executed the lien waiver requested by FSA and even if Snowville had received the FSA loan proceeds, Snowville could not have performed by the dates required under the terms of the confirmed plan. Mr. Love admitted that even if the FSA loan had [g]one through, Barnes and LIICOA would still need to agree to defer payments owing under the confirmed plan to LIICOA or Barnes, . . ."[4]

d.  "Since the provision [in the plan] mentioning FSA loans doesn't directly relate to LIICOA, instead referring tot he claims of Barnes Bank, the plan does not seem to have directly called for the use of an FSA loan to satisfy LIICOA."[5]

e.  In addition, there is no mention that either Barnes or LIICOA would need to subordinate, release or waive liens. This raises substantial doubt as to whether LIICOA had sufficient notice in the plan that it would be required to enter into [the FSA] agreement."[6]

---

[2]  Findings of Fact Transcript, 206:13-23.

[3]  Findings of Fact Transcript, 206:24-207:7.

[4]  Findings of Fact Transcript, 210:11-20.

[5]  Findings of Fact Transcript, 213:8-12.

[6]  Findings of Fact Transcript, 213:13-17.

3

f. Snowville has not carried its burden to prove the plan directly addressed the FSA loan proceeds in relation to the 1142 argument as to each creditor. Accordingly the motion is denied."[7]

g. "The Court has determined that the confirmed plan did not require [Barnes and LIICOA] to execute lien waivers. Accordingly, the Court determines that Barnes and LIICOA are not in breach of the confirmed plan."[8]

h. "As it is, if the Court were to grant the motion, the Court perceives it would be writing into the plan terms and conditions that were not explained or addressed or even voted on. Even an implied duty of good faith and fair dealing does not go as far as the debtor requests. There was simply inadequate notice to Barnes and LIICOA of these requirements."[9]

i. "The evidence presented at this hearing on this matter shows that even if Snowville could obtain the FSA loan, it would not be able to make timely payments to Barnes and LIICOA as required by the plan. . . . Snowville simply is not in a position to perform under the terms of the confirmed plan."[10]

On March 27, 2006, the Reorganized Debtors filed a Notice of Appeal, appealing this Court's order denying the Plan Enforcement Motion to the United States Bankruptcy Appellate Panel for the Tenth Circuit (the "BAP"). On appeal, the BAP affirmed the Bankruptcy Court and held that "the bankruptcy court correctly found that Barnes and LllCOA did not breach the plan."

On December 17, 2007, Love Farming Group, which allegedly consists of Mr. Love, Snowville, Valayne Love, and the Debtor (the "Plaintiffs"), filed a Complaint against Barnes (the "Defendant") in the First Judicial District Court of Box Elder County, Utah (the "State Court"). The Complaint alleged that Barnes breached the Joint Plan by refusing to sign lien waivers and by refusing to honor checks drawn on account with sufficient funds; that Barnes

---

[7] Findings of Fact Transcript, 213:23-214:1.

[8] Findings of Fact Transcript, 214:17-20.

[9] Findings of Fact Transcript, 215:18-24.

[10] Findings of Fact Transcript, 217:9-18.

4

breached the covenant of good faith and fair dealing; that Barnes breached a fiduciary duty; and that the Love Farming Group was injured as a result of the foregoing breaches.[11]  The State Court action was subsequently timely removed to this Court by the Defendant.

Trustee has alleged that the Plaintiffs did not seek nor obtain Trustee's or the Court's permission to file the Complaint, and have no authority to act for themselves in attempting to realize on these alleged claims.  It is further alleged that Trustee did not give his consent for the Debtor to be named as a plaintiff or for Russell S. Walker, David R. Williams, or Mr. Robert Smith to act as counsel for the Debtor in the State Court action against Barnes.

After learning about the Complaint, Trustee entered into settlement negotiations with Barnes with respect to the Debtor's claims.  On January 7, 2008, the Debtor, acting through its Trustee, entered into a Settlement Agreement (the "Settlement Agreement") with Barnes to resolve and compromise all claims and disputes which exist between them regarding the Complaint.  As part of settlement, Barnes has agreed to pay Trustee $7,500 ("Settlement Amount") and Trustee has agreed to release Barnes from any and all claims asserted in the Complaint that belong to the bankruptcy estate of the Debtor.

On January 17, 2008, Trustee filed the present Motion seeking the Court's approval of the Settlement Agreement.  On February 7, 2008, Mr. Love, on behalf of Post-Confirmation Committee of Snowville, Mr. Love, and the Debtor (otherwise referred to as "the Love Farming Group"), filed a Memorandum in Opposition to Trustee's Motion.  The Trustee and the Love Farming Group spelled out the facts and presented their oral arguments at the hearing.

---

[11]      See Tr.'s Ex.  2.

It is within these parameters that the Court considers the present Motion and the objection.

## II.     JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(G).  Venue is appropriate under 28 U.S.C. § 1408(1).  Notice for consideration of the Motion is deemed and found appropriate in all respects.

## III.    ANALYSIS

In his Motion, Trustee asserts that only he, as the official representative of the Debtor's estate, has the authority to bring the claims asserted in the Complaint and obtain a settlement with respect to those claims.  Accordingly, after the Complaint was removed to this Court, Trustee asserts that he was acting within his authority when he engaged in negotiations and reached a settlement with Barnes regarding of the claims asserted in the Complaint.  Trustee further asserts that based on the arguments and evidence presented at the February 12, 2008 hearing, there are sufficient grounds for the Court to approve the settlement under the standard prescribed in Kopp v. All Am. Life Ins. Co. (*In re Kopexa Realty Venture Co.*), 213 B.R. 1020 (B.A.P. 10th Cir. 1997).

The Plaintiffs, on the other hand, argue that Trustee has no authority to compromise a claim that belongs to the Love Farming Group.  They argue that when the Court entered an order on May 15, 2005, substantively consolidating the bankruptcy estates of the Debtor, George Love Farming Partnership, Mr. Love and Snowville into Case No. 04-36559, a partnership known as "Love Farming Group" was created.  The Plaintiffs assert that the claims against Barnes alleged in the Complaint belong to the Love Farming Group as an entity, and not to any individual

6

partner such as the Debtor.  Consequently, the claims against Barnes are not an asset of the

Debtor, and as such, Trustee for the estate of George Love Farming has no interest in those

claims.  Further, since only the "partnership" of the Love Farming Group has those claims, the

lawsuit against Barnes did not violate the automatic stay as Trustee has alleged.

The determination of these issues requires a brief review of the history of this case and

the Consolidated Case.  Specifically, the Court notes its Memorandum Decision Denying

Debtor's Motion to Convert issued on March 23, 2007 (the "March 23 Memorandum Decision")

issued in the Consolidated Case.  The Court adopts each and every finding and conclusion in the

March 23 Memorandum Decision[12] as these relate to and address critical issues argued in

Trustee's Motion.

Among other findings made in the March 23 Memorandum Decision, the Court denied

the Debtor's Motion to convert its chapter 7 case to one under chapter 11.  Additionally, on page

15 of the March 23 Memorandum Decision, the Court opined as to the consequences of the

substantive consolidation of the various entities that Mr. Love had created.  This is relevant

because the main issue in the present matter appears to be whether Trustee has standing to

compromise claims that the Plaintiffs allege belong to the Love Farming Group as a partnership.

If, by virtue of the consolidation and other matters that have occurred in the Consolidated Case, a

partnership was created then Plaintiffs have a legitimate objection.  If, on the other hand, no

partnership was created by consolidation, their objections do not carry as much weight.

The Plaintiffs cite to the Joint Plan and the Order Confirming Joint Plan dated December

19, 2005, in suggesting that only a post-petition committee comprised of Snowville, Mr. Love,

---

[12]   The March 23 Memorandum Decision is attached to this Memorandum Decision for ease of
reference.

and their professionals, may make decision regarding the prosecution of any claims or causes of

action pertaining to the Love Faring Group.  Accordingly, the Plaintiffs claim that since the

chapter 7 Trustee is not on this committee, he has no authority to compromise or transfer claims

that belong to the Love Farming Group as an entity.

Trustee, on the other hand, argues that by this Court's prior findings and rulings, no

partnership was ever created.  He contends that although the name "Love Farming Group" was

referred to in the Joint Plan, that phrase was used just for ease of reference throughout the Plan,

and there was no intent or any actual creation of any partnership.  In essence, it was a defined

term created for ease of reference only.

The Court has had occasion to consider this issue previously.  In its March 23

Memorandum Decision, and specifically on pages 15, 16  and 17, the Court stated:

> After reviewing the record in this case and in the chapter 11 case, the Court
> concludes that although George Love Farming, LC was not originally a debtor in
> the chapter 11 case, it became a debtor as a result of the Court's Order of
> Substantive Consolidation. When a court substantively consolidates bankruptcy
> estates, the effect is "to pierce the several corporate veils and to disregard the
> existence of the separate corporate entities." In re Gulfco Investment Corp., 593
> F.2d 921, 928 (10th Cir. 1979); In re Bonham, 229 F.3d 750, 765-66 (9th Cir.
> 2000). The result is the creation of "one common pool consisting of assets,
> liabilities and a single body of creditors, while extinguishing the intercorporate
> liabilities of the consolidated entities." In re Creditors Service Corp., 195 B.R.
> 680, 689 (Bankr. S.D. Ohio 1996). Substantive consolidation "treats separate
> legal entities as if they were merged into a single survivor left with all the
> cumulative assets and liabilities." In re Owens Corning, 419 F.3d 195, 205 (3d
> Cir. 2005). Thus, it has been said that substantive consolidation should be used
> sparingly because it is a tool "vitally affecting substantive rights." In re Flora Mir
> Candy Corp., 432 F.2d 1060, 1062 (2d Cir. 1970).
>
> The Court determines that the Substantive Consolidation Order entered in the chapter 11
> case had the desired effect — it substantively consolidated the estates and liabilities of
> Snowville Farms, LLC, George Love Farming LC, George Love Farming Partnership,
> George Love Family Partnership and George Love, creating a single debtor with a single
> set of assets and liabilities (the Consolidated Estate). Thus, under the case law discussed

8

above the logical conclusion in this case is that each debtor became an alter ego for the other as a result of the Consolidation Order. So when George Love Farming, LC filed this chapter 7 case, it did so as the alter ego of the entire Consolidated Estate. To that end, it appears that the present chapter 7 estate includes all of the assets and liabilities of the Consolidated Estate because it includes all of the Consolidated Entities.

In the alternative, the Court concludes there is sufficient evidence in this case to affirmatively apply the alter ego doctrine to the Debtor, George Love, and the Consolidated Entities. A court may disregard a corporate entity under the alter ego doctrine if: 1) there is a unity of interest and ownership such that the separate personalities of the entities no longer exist; and 2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an inequity. d'Elia v. Rice Development, Inc., 147 P.3d 515, 522 (Utah App. 2006). The Court determines that these elements are present in this case.

As discussed in the examiner's Initial Report, the separate personalities of each of the Consolidated Entities no longer exists. The examiner's findings as to the relationship between Mr. Love and his various entities (including George Love Farming, LC) are as relevant to this case as they were in the chapter 11 case. Also, the Court has seen first-hand how Mr. Love treats George Love Farming LC and the other Consolidated Entities. When it benefitted his interests, he represented to the Court that the Dry Farm and the Sanda Rosa Farm were "fully subject to Trustee's legal ownership." Notice of Debtor's Agreement as to Ownership of Property, George Love Farming LC, 06-20612 (Docket No. 40) (admitting that the chapter 7 Trustee has "legal ownership" of the Sanda Rosa Farm and the Dry Farm). The Court interprets this admission to mean that the estate owns 100% of the farm properties. When his interests shifted, however, he argued in opposition to Trustee's Motion to Sell the Dry Farm that Trustee held title to only 25% of the farm properties. Further, at the hearing on this matter, Mr. Love testified that George Love Farming LC owns approximately $400,000 in cash. When asked where the cash was located, he testified that it was in the chapter 11 debtor in possession account.

The Court also believes that it would be unjust and inequitable to continue recognizing the various separate corporate forms of each of the Consolidated Entities. The administration of this chapter 7 case has been delayed by Mr. Love's indecision as to whether George Love Farming, LC owns full title to the farm properties. If the Court continued to respect the various corporate forms of the Consolidated Entities, the Court believes there would be no end to the confusion and delay caused by this indecision. Further, LIICOA and Barnes are secured by the farm properties but have been frustrated in their efforts to exercise their rights in this case and the chapter 11 case because the Debtor continues to argue the distinction between the Consolidated Estate and the current Debtor. At the same time, Mr. Love continues to control the properties (collateral for Barnes and LIICOA) as the purported principal for the Consolidated Estate. This is unfair and inequitable.

9

Based on the facts of this case, even if the Court had not previously entered its Order of Substantive Consolidation, the Court finds that George Love Farming, LC and the Consolidated Entities are alter egos of each other and of Mr. Love himself. Accordingly, the Court believes it appropriate to consider the Consolidated Debtors' actions in the chapter 11 case to determine whether it now seeks to convert this case in bad faith. These findings and conclusions are the law of the case.

The March 23 Memorandum Decision was not appealed, and therefore, remains the law of the case.[13] The Court determines that those findings are as applicable now as they were on March 23, 2007, and nothing has changed in the interim that would change those findings. In its March 23 Memorandum Decision, the Court did find that there was a consolidation of assets and liabilities, but there was no finding that a partnership existed separate and apart from the individuals and/or entities that comprised the Consolidated Estate.

The Court wants to be consistent in its rulings. Based on the foregoing analysis as well as the evidence and arguments presented at the February 12, 2008 hearing on Trustee's Motion, the Court determines that Trustee has standing and authority to compromise claims asserted against Barnes by the Plaintiffs. The Court further finds that no partnership was ever created by the Joint Plan or the Order Confirming the Joint Plan. The Court agrees with Trustee that the name "Love Farming Group" was intended to be used as a reference to the consolidated parties and did not have the effect of creating a partnership. Further, no evidence was presented at the hearing that any partnership has been operating the farming property since the issuance of the March 23 Memorandum Decision. Accordingly, the Court finds that the chapter 7 Trustee has standing and authority to seek a compromise and to settle the claims asserted against Barnes.

---

[13]   See Anthony v. Baker, 955 F.2d 1395, 1397 n.1 (10th Cir. 1992) ("The law of the case doctrine is a 'restriction self-imposed by the courts in the interest of judicial efficiency. It is a rule based on sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued reargument of issues already decided.' The law of the case doctrine 'encompasses a court's explicit decisions, as well as those issues decided by necessary implication.'") (internal citations omitted).

Further, as Trustee for the Debtor and implicitly for the Consolidated Estate, only he may seek recovery from Barnes for any alleged wrong.

The Court will now address whether it should approve the proposed Settlement Agreement between Trustee and Barnes.  Rule 9019(a) of the Federal Rules of Bankruptcy Procedure allows the Court, after notice and a hearing, to approve settlements reached by the Trustee.  The Tenth Circuit Bankruptcy Appellate Panel in the case of In re Kopexa Realty Venture, 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997), has set forth a four-factor test that the Court should consider in determining the propriety of a settlement: (1) the probable success of the underlying litigation on the merits, (2) the potential difficulty in collecting on a judgment, (3) the complexity and expense of the litigation, and (4) the interests of creditors in deference to their reasonable views.

As to the first factor, the probability of success of the underlying State Court litigation, the Court determines that this factor weighs in favor of approving the settlement.  Trustee asserts that this Court and the Tenth Circuit BAP have already determined that there was no breach of the Joint Plan by Barnes because Barnes had no duty to execute the lien waivers.[14]  The Court agrees with Trustee that the Plaintiffs' Complaint is primarily based on Barnes' alleged breach of the Plan for failure to execute the lien waiver. Given that this Court has already ruled that there was no such breach by Barnes or LIICOA, there is little or no likelihood that the Plaintiffs would prevail in their litigation.  Furthermore, as to other alleged breaches or improper conduct by Barnes that may have occurred after the March 23 Memorandum Decision, the Court is

---

[14]     See Findings of Fact Transcript, 214:17-20, "The Court has determined that the confirmed plan did not require [Barnes and LIICOA] to execute lien waivers. Accordingly, the Court determines that Barnes and LIICOA are not in breach of the confirmed plan." On May 4, 2007, the Tenth Circuit B.A.P. affirmed this finding.

persuaded and finds that these are complicated and fact intensive issues that further reduce the

probability of success on the merits in the underlying litigation.  According, the claims set forth

in the Complaint are not likely to prevail on their merits.

As to the second factor, the potential difficulty in collecting on a judgment, the Court

finds that this factor is not at issue in this matter.

As to the third factor, the complexity and expense of litigation, the Court determines that

this factor weighs in favor of approving the settlement.  The Court believes that there is no

guarantee that Trustee or the other Plaintiffs will recover through litigation and any expense of

Trustee in pursuing this matter will be burdensome and expensive.  The Plaintiffs assert that they

will bear the costs of litigation and that there will be no cost to the estate, but that it will

participate in any recovery as a partner.   However, this begs the question of whether parties

without proper standing should be allowed to assert claims that they do not possess.

Accordingly, since the issues involved in the underlying case are complex and will be expensive

to litigate with no guarantee of recovery, the Court finds that this factor weighs in favor of

granting Trustee's Motion.

As to the fourth and final factor, the interests of creditors in deference to their reasonable

views, the Court finds that this factor weighs in favor of approving the settlement.  Trustee

argues that this settlement will generate $7,500 with little cost to the estate to collect those funds.

The Court agrees and finds that this settlement will generate an increase in the cash assets of the

estate, which will assist Trustee in paying creditors' claims.  Accordingly, the Court finds that

the settlement is in the best interest of the creditors.  The Court has considered the objections and

12

arguments of the Love Farming Group and has given them deference, and finds that they are not persuasive.

In viewing this matter under the totality of circumstances, being informed of the facts of this matter, and based on an objective view of the same,[15] the Court determines that the Plaintiffs have not sustained their burden of showing that they have proper standing to pursue the claims asserted in their Complaint against Barnes.  Furthermore, the Court is persuaded that Trustee, as the representative of the George Love Farming, LC bankruptcy estate, has the authority and standing to seek and obtain a settlement with Barnes.  Finally, under a totality of the circumstances as elicited by the factors discussed by <u>Kopexa Realty</u>, the Court determines that the Trustee's Motion to approve the settlement is appropriate.  Accordingly, Trustee's Motion is granted and the Plaintiffs' objection is overruled.  A separate order granting Trustee's Motion and overruling Plaintiffs' objection will accompany this Memorandum Decision.

_____END OF DOCUMENT_____



---

[15]     <u>Reiss v. Hagmann</u>, 881 F.2d 890, 892 (10th Cir. 1989).

_____ooo0ooo_____

**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the

Bankruptcy Noticing Center to each party listed below:

Joel T. Marker
Jeremy C. Sink
McKay, Burton & Thurman
170 South Main Street, Suite 800
Salt Lake City, UT 84101

Russell S. Walker
David R. Williams
Woodbury & Kesler, P.C.
265 East 100 South, Suite 300
Salt Lake City, UT 84110-3358

Paul James Toscano
Thomas D. Neeleman
Neeleman & Toscano, LC
10 Exchange Place, Suite 614
Salt Lake City, UT 84111

United States Trustee (via Electronic Mail)

M. Robert Smith
31 Federal Avenue
Logan, UT 84321

Dale W. Westenskow
Robison, Hill & Company
1366 E. Murray-Holladay Road
Murray, UT 84123

**The below described is SIGNED.**



**Dated: March 23, 2007**      _William J. Thurman_
                               **WILLIAM T. THURMAN**
                               **U.S. Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

---

In re:

**George Love Farming, LC,**               Bankruptcy Number 06-20612

    Debtor.                    Chapter 7

---

**MEMORANDUM DECISION DENYING DEBTOR'S MOTION TO CONVERT**

---

The matter before the Court is the Debtor's Motion to Convert to chapter 11 of the

Bankruptcy Code.  The Debtor is one of five entities which were substantively consolidated in a

separate chapter 11 case.  Although the chapter 11 case is still pending, the Debtor commenced

this chapter 7 case alone, and the Debtor now seeks to convert this case to chapter 11.  The U.S.

Trustee, the chapter 7 Trustee, and two secured creditors objected, arguing that the Debtor is

attempting to convert this case in bad faith.  The Court agrees.

**I.      JURISDICTION AND VENUE**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and

157(b)(2)(A).  Venue is appropriate under 28 U.S.C. § 1408(1).

1

## II.     BACKGROUND

This case is complicated.  For purposes of this Memorandum Decision, the Court

believes it essential to discuss how this case has developed.

On October 12, 2004, Snowville Farms, LLC and Mr. George Love commenced separate

chapter 11 bankruptcy cases.  On March 3, 2004, the Court *sua sponte* ordered the appointment

of an examiner for the bankruptcy estates of Snowville Farms, LLC and Mr. Love to investigate

whether they should be substantively consolidated with the assets and liabilities of several non-

debtor entities owned or controlled by Mr. Love.  The examiner conducted a lengthy

examination of Mr. Love and his related entities, and filed an Initial Report and

Recommendation on April 15, 2005.[1]  Through his Initial Report, the examiner made the

following findings:

- Historically, Mr. Love paid very little attention to the form within which he operated these businesses.[2]
- George Love Farming Partnership presently has no assets, liabilities, or operations.[3]
- In theory, Snowville Farms, LLC is one of the owners of the land comprising the Farm, but has no operations.  In practice, some of the Farm's operations are still conducted using Snowville's name.[4]

---

[1]The Initial Report was not offered into evidence at the hearing in this matter, but the Court has authority to take judicial notice of its own records, and does so with respect to the Initial Report. St. Louis Baptist Temple, Inc. V. Federal Deposit Insurance Corp., 605 F.2d 1169, 1172 (10th Cir. 1979).

[2]Initial Report and Recommendation of Examiner at ¶ 27, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[3]Initial Report and Recommendation of Examiner at ¶ 30, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[4]Initial Report and Recommendation of Examiner at ¶ 31, Snowville Farms, LLC, 04-36559 (Docket No. 260).

- Each of the Related Persons and Entities[5] shares a common business address — Mr. Love's residence, which contains a single home office.[6]
- Neither Snowville Farms, LLC nor the George Love Farming Partnership LC has any employees.[7]
- All of the Related Persons and Entities use the same computer accounting system.[8]
- Although the livestock and equipment used in the Farm operation is nominally owned by George Love Farming LC, it is maintained by employees of George Love Family Partnership, and the insurance for the property is paid by Snowville Farm, LLC's bank account.[9]
- The Farm Group has been operated as one entity. Mr. Love only considers the Farm Group as separate entities for tax and accounting purposes. Mr. Love also stated in his examination by Aegon that the Farm Group really does not have an independent existence.[10]
- In theory, title to all the equipment used in the Farm operations is in the name of George Love Farming, LC. In reality, the evidence is mixed. There is evidence that some farm equipment is owned by Mr. Love and Snowville Farms, LLC.[11]
- Mr. Love maintains computer records of the vendors of the Farm Group. The list is maintained on a consolidated basis; there is no separation of vendors by the entities comprising the Farm Group.[12]

---

[5]The Initial Report defined "Related Persons and Entities" as Mr. Love, Mrs. Love, Snowville Farms, LLC, George Love Farming LC, George Love Family Partnership, JFS Food Services, Lc, and George Love Construction, Inc.

[6]Initial Report and Recommendation of Examiner at ¶ 44, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[7]Initial Report and Recommendation of Examiner at ¶ 45, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[8]Initial Report and Recommendation of Examiner at ¶ 50, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[9]Initial Report and Recommendation of Examiner at ¶ 52, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[10]Initial Report and Recommendation of Examiner at ¶ 53, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[11]Initial Report and Recommendation of Examiner at ¶ 63, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[12]Initial Report and Recommendation of Examiner at ¶ 67, Snowville Farms, LLC, 04-36559 (Docket No. 260).

- It appears that creditors of the Farm Group dealt with the Farm Group as a single economic unit.[13]
- Mr. Love is personally liable on most of the debts of the Farm Group.[14]
- The Farm Group[15] maintains a single bank account in the name of Snowville Farms, LLC.  Thus, the George Love Family Partnership, George Love Farming LC, and the George Love Farming Partnership do not have bank accounts.  Moreover, the source of the George Love Family Partnership's start up capital was funds from Snowville Farms, LLC's account.  All revenues of the Farm operations are paid into this single account to pay the combined bills of the Farm Group.[16]
- Mr. Love and Mrs. Love have sometimes used the Farm Group's account as their personal piggy-bank.[17]

On the basis of these findings, the examiner recommended the substantive consolidation of Mr. Love, Snowville Farms, LLC, George Love Farming LC, George Love Farming Partnership, and George Love Family Partnership.

While the examiner was preparing his report, Snowville Farms and Mr. Love filed a Motion to Substantively Consolidate the bankruptcy estates of Snowville Farms and Mr. Love with the assets and liabilities of George Love Farming, LC, George Love Farming Partnership, and the George Love Family Partnership.[18]   The Court held a hearing on the Substantive

_____

[13]Initial Report and Recommendation of Examiner at ¶ 68, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[14]Initial Report and Recommendation of Examiner at ¶ 71, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[15]The Initial Report defined the "Farm Group" as Snowville Farms, LLC, George Love Family Partnership, and George Love Farming LC.

[16]Initial Report and Recommendation of Examiner at ¶ 75, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[17]Initial Report and Recommendation of Examiner at ¶ 90, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[18]The initial Motion did not seek to include the bankruptcy estate of Mr. Love in the Substantively Consolidated estate.  At the hearing on the Motion, however, Mr. Love and Snowville Farms, LLC orally modified their Motion to include Mr. Love's bankruptcy estate.

Consolidation Motion and considered the examiner's Report on April 21, 2005. Relying in part

on the examiner's thorough report and recommendation to which there were no objections, and

after receiving evidence and hearing oral arguments, the Court granted the Motion. On May 15,

2005, the Court issued an Order Substantively consolidating the bankruptcy estates of George

Love Farming LC, George Love Farming Partnership, George Love Family Partnership, Mr.

George Love, and Snowville Farms LLC into case no. 04-36559 (the "Consolidated Estate").

The Substantive Consolidation Order specifically purported to consolidate "all assets and

liabilities" of the bankruptcy estates discussed above.[19]

The primary assets of the consolidated estate were two large farming properties: one dry

farm (the "Dry Farm") and one irrigated farm (the "Sanda Rosa Farm"). Both farms are located

in northern Utah and for the past several years have been used to grow organic wheat and alfalfa

crops. Since the inception of the Consolidated Case, Mr. George Love has operated a farming

operation on the Dry Farm and the Sanda Rosa Farm as a member and principal of the

Consolidated Estate.

On December 12, 2005, the Court confirmed a chapter 11 plan for the Consolidated

Estate which provided a specific and detailed payment schedule to be made to various secured

creditors. The plan provided Barnes Bank a claim for $673,949.55 plus interest, fees, and costs,

secured by all crop related receivables, the 2004 harvested wheat remaining in bins, in all 2005

future year crops, and in government assistance payments. The plan also provided Life Investors

Insurance Company of America ("LIICOA") a claim for $7,011,910.97, secured by the two

---

[19]The Substantive Consolidation Order was drafted and submitted for the Court's
approval by counsel for Snowville Farms, LLC and by counsel for Mr. George Love.

5

farms and by a second position lien on all crop-related accounts receivable and proceeds from

2005 crops.  Under the terms of the plan, the Consolidated Debtors were required to pay Barnes

$550,000 by December 30, 2005 and was required to pay LIICOA $320,000 by January 20,

2006.   The Consolidated Debtors commenced making payments to all creditors under the

confirmed plan except Barnes and LIICOA.  It failed to pay Barnes on December 30, and failed

to pay LIICOA on January 20.  In response, Barnes Bank and LIICOA attempted to exercise

their rights under the plan by scheduling foreclosure sales on their collateral.

In an attempt to avoid foreclosure, the Consolidated Debtors filed a Motion to Amend the

Plan of Reorganization on January 26, 2006. The Motion sought to require Barnes and LIICOA

to subordinate their security interests to the federal government so that the Debtor could fund its

plan with an FSA loan.  After an evidentiary hearing, the Court denied the Motion to Modify,

finding that the Debtor had already substantially consummated its plan of reorganization.  On

February 14, 2006, the Consolidated Debtors filed a Motion to Enforce the terms of their

confirmed plan.  On February 21, 2006, the Consolidated Debtors filed an adversary proceeding

against LIICOA and, one day later, filed a Motion for Preliminary Injunction.  Both the Motion

to Enforce and the Motion for Preliminary Injunction sought the same or similar relief to that

requested in the Motion to Modify (i.e., subordination for the FSA loan).  The Court held a

hearing on both Motions on March 1, 2006 and March 3, 2006 and denied each of them after a

lengthy evidentiary hearing.

On March 6, 2006, the Consolidated Debtors with the exception of Mr. George Love,

filed a Motion to Convert the chapter 11 case to one under chapter 7 of the Bankruptcy Code.

The Court held a hearing on the Motion to Convert the same day it was filed, March 6, 2006.  At

6

that hearing, the Court specifically noted that it could not carve Mr. George Love out of an order

converting the case because the case had been substantively consolidated.  In response, counsel

for the Consolidated Debtors amended its Motion to request dismissal rather than conversion.

The Court denied the Motion, finding that the Consolidated Debtors did not have an absolute

right to convert because a chapter 11 plan had been confirmed and also finding that dismissal

would not be in the best interests of creditors.

The next day, George Love Farming, LLC, one of the Consolidated Debtors in the

chapter 11 case, filed the present chapter 7 case.  LIICOA immediately filed an Emergency

Motion to Dismiss the chapter 7 case or, in the alternative, for Relief from the Automatic Stay.

Through the Motion to Dismiss, LIICOA argued that the Debtor had filed this case in bad faith.

In opposition, the Debtor argued that its motivation in filing for chapter 7 relief was to

"wind-up" and preserve assets for a trustee's orderly liquidation of the estate. Specifically, the

Debtor's Memorandum in Opposition to LIICOA's Motion to dismiss stated that "[t]he intent of

this bankruptcy proceeding is to liquidate the Debtor's assets for the benefit of and in the best

interest of all creditors and therefore precludes dismissal under Bankruptcy Code sec. 707."[20]  At

the hearing on LIICOA's Motion, held on March 13, 2006, counsel for the Debtor stated that "it

would not be the intent of George Love Farming to continue to pester the Court with additional

bites at the apple."[21]  Counsel for the present chapter 7 Debtor further stated that "[t]he purpose

is completely different from a Chapter 11 and it's basically an admission that the property needs

---

[20]Debtor's Memorandum in Opposition to Motion to Dismiss at *6, George Love
Farming LC, 06-20612 (Docket No. 9).

[21]Transcript of Oral Argument at 32, March 13, 2006 (Creditor's Exhibit 3).

to be liquidated in favor of all creditors."[22]  Relying in part on these representations, the Court

denied the Motion to Dismiss but continued the Motion for Relief for a final evidentiary hearing.

The Court held a final hearing on the Motion for Relief on April 24, 2006, wherein the

parties submitted evidence including competing appraisal reports and associated testimony.[23]  On

May 10, 2006, the Court issued a Memorandum Decision and Order Denying the Motion for

Relief.

The Memorandum Decision specifically stated that "[t]he other members of the chapter

11 estate did not join in this bankruptcy case, but at the hearing on this matter, they each

represented to the Court that they would agree to be bound by the Court's determination in this

matter."[24]  In connection with that representation, on May 1, 2006, the Debtor filed a Notice of

Debtor's Agreement as to Ownership of Property, signed by the Debtor's counsel ("Debtor's

Notice").[25]  The Notice states that "[t]he Debtor hereby agrees that all interests in and to both of

the foregoing real property are subject to this Court's jurisdiction in this case number 06-20612

and fully subject to the Trustee's legal ownership for administration hereunder."[26]

On May 25, 2006, the chapter 7 Trustee filed a Motion to Sell the Dry Farm free and

---

[22]Transcript of Oral Argument at 34, March 13, 2006 (Creditor's Exhibit 3).

[23]The final hearing on the Motion for Relief was conducted by Judge Tom Cornish, who
certified familiarity with the record pursuant to Bankruptcy Rule 9028.  No parties objected to
Judge Cornish presiding over the hearing.

[24]Memorandum Decision and Order Denying Motion for Relief at * 2, George Love
Farming LC, 06-20612 (Docket No. 49).

[25]Notice of Debtor's Agreement as to Ownership of Property, George Love Farming LC,
06-20612 (Docket No. 40) (Trustee's Exhibit C).

[26]Notice of Debtor's Agreement as to Ownership of Property at ¶ 5, George Love
Farming LC, 06-20612 (Docket No. 40) (Trustee's Exhibit C).

8

clear of liens and encumbrances under § 363(h).  Despite the language discussed above in the

Debtor's Notice, the Debtor and Mr. George Love objected to the proposed sale, arguing that the

Debtor only owned 25% of the Dry Farm.  They argued that the remaining 75% interest in the

Dry Farm was held by Mr. George Love, Valayne Love, and Snowville Farms, LLC.  These

arguments were also made despite a Relinquishment of Farming Interests filed by Valayne Love

in the chapter 11 case, wherein Valayne Love stated that she "hereby forever relinquishes to the

Chapter 11 Estate. . . all of her right title and interest in any of the following: 1) Snowville Farm,

LLC; 2) George Love Farming Partnership; 3) George Love Farming LC; 4) George Love

Family Partnership; 5) the Love Farming Group; and 6) Any of the assets of the foregoing."[27]

Recognizing that § 363(h) required an adversary proceeding, the Court denied the Trustee's

Motion to Sell without prejudice.

On June 21, 2006, in an apparent effort to avoid the Trustee's sale of the Dry Farm, the

Debtor filed a Motion to Convert Case to Chapter 12.  The Debtor failed to schedule the Motion

for a hearing before the Court, however, so the Court did not have occasion to rule on the sought

conversion.

Two days later, on June 28, 2006, the chapter 7 Trustee filed an adversary proceeding

against Mr. George Love, Valayne Love, Snowville Farms, LLC, George Love Family

Partnership and George Love Family Partnership seeking to sell the Dry Farm and the Sanda

Rosa Farm under § 363(h).  On July 11, 2006, Mr. George Love, Valayne Love, and Snowville

Farms, LLC conveyed their interest in the Dry Farm to the chapter 7 Trustee, thereby eliminating

---

[27]Valayne Love Relinquishment of Farming Interests, Snowville Farms, LLC, 04-36559
(Docket No. 282) (filed May 16, 2005).

9

the need for the Trustee to continue with the adversary proceeding as to the Dry Farm. With

respect to the Sanda Rosa Farm, on October 3, 2006, the Court entered a stipulated judgment in

the adversary proceeding which provides that the chapter 7 Trustee "has authority to sell both the

estate's interest and the interest of any co-owner in the Sanda Rosa farm" (the "Stipulated

Judgment").

With this accomplished, the Trustee filed a Motion to Sell the Dry Farm under § 363(b)

on July 13, 2006. The Court held a hearing on the Motion to Sell on August 10, 2006 and issued

an Order granting the Motion on the same day. The Trustee closed on the sale soon thereafter.

On March 8, 2007, the chapter 7 Trustee filed a Motion to Sell the Sanda Rosa Farm.

Four days later, on March 12, 2007, the Trustee filed a Motion for Contempt against George

Love. The Court held a hearing on the Motion for Contempt on March 15, 2007. At that

hearing, the parties submitted evidence that the Real Estate Purchase Contract at issue in the

Trustee's Motion to Sell had been breached when Mr. Love began excavating three miles of

PVC pipe from the Sanda Rosa Farm and began moving five pivots from one area of the farm to

another without the knowledge or permission of the Trustee or the Court. In exchange for

moving the pivots from one area of the farm to another, Mr. Love traded the pipe to the

excavator. The pipe was collateral for LIICOA's perfected security interest, but Mr. Love did

not inform or obtain its consent for the trade. Mr. Love testified and argued that he was entitled

to operate the farm business because the Debtor owns only a 25% interest in the Farm and

because he is acting as the principal for the Consolidated Estate, which he stated holds a 75%

interest in the Farm. After considering the evidence and oral arguments presented, the Court

held that Mr. Love had violated the automatic stay by continuing to operate the Farm after the

10

chapter 7 case was filed and by removing the pipes from the Farm. The Court noted that the

Trustee had not obtained permission under § 721 of the Bankruptcy Code to operate the

business.[28]

On March 14, 2007, the Debtor filed the present Motion to Convert this case to one under

chapter 11 of the Bankruptcy Code. The Motion to Convert states that the Debtor is only a 25%

owner of the Sanda Rosa farm with the remaining ownership interest held by the Consolidated

Debtors, and states that the Debtor is allowed a "one-time conversion" absent bad faith. The

U.S. Trustee, the chapter 7 Trustee, LIICOA, and Barnes Bank each objected to the Motion to

Convert, arguing that it is made in bad faith.

## III.    ANALYSIS

Under §§ 706(a) and (d), a chapter 7 debtor generally has a right to convert to chapter 11

so long as the debtor is eligible to be a debtor under chapter 11, has not previously converted the

case to chapter 7 and is not converting the case in bad faith.[29]

As the U.S. Supreme Court recently held in In re Marrama, a bankruptcy court has

discretion to deny a debtor's motion to convert under § 706(a) if the court finds that the debtor is

attempting to convert in bad faith.[30]  The Marrama Court did not determine what constitutes bad

faith, but stated that, "[i]t suffices to emphasize that the debtor's conduct must, in fact, be

---

[28]After the Court issued its ruling at the hearing on the Trustee's Motion for Sanctions,
the Trustee admitted that the decision to remove the pipe and move the pivots made sound
business sense. Thus, following the Court's ruling from the bench, the Trustee orally requested
(with the consent of LIICOA) and obtained limited permission under § 721 to finish removing
the pipe and pivots.

[29]Marrama v. Citizens Bank of Mass., — U.S. —, 127 S.Ct. 1105 (2007).

[30]Id. at 1112.

11

atypical."[31]  The facts of <u>Marrama</u> are instructive, however, since the language of § 706 relates

equally to chapters 11 and 13.  In that case, a chapter 7 debtor filed misleading or inaccurate

statements and schedules which omitted his interest and transfer of his home within 1 year of

filing.[32]  Before attempting to convert the case to chapter 13, the debtor admitted that the purpose

of transferring his home within 1 year of filing was to protect his property from creditors.[33]  On

these facts, the bankruptcy court denied the debtor's motion to convert to chapter 13, and the

Supreme Court affirmed.

There is no specific test in the Tenth Circuit to guide a court's consideration of whether a

Motion to Convert is filed in bad faith under § 706(a).  But in <u>Marrama</u>, the Supreme Court

implied that a court's inquiry should consider factors historically applied to motions to convert

or dismiss.[34]  Courts in the Tenth Circuit look to the following factors in considering whether to

dismiss or convert a chapter 11 case for bad faith:

1)  whether the debtor has one asset;
2)  whether the debtor's pre-petition conduct has been improper;
3)  whether there are only a few unsecured creditors;
4)  whether the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
5)  whether the debtor and one creditor have proceeded to a standstill in a prior forum, and the debtor has lost;
6)  whether the filing of the petition effectively allows the debtor to evade court orders;

---

[31]<u>Id.</u> at 1112, n.11.

[32]<u>Id.</u> at 1108.

[33]<u>Id.</u>

[34]<u>Marrama</u>, 127 S.Ct. at 1111 ("In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct, including fraudulent acts committed in an earlier Chapter 7 proceeding, is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13.").

7)      whether the debtor has no ongoing business or employees; and

8)      whether there is a lack of possibility for reorganization.[35]

The Court elects to apply the factors listed above, in connection with a totality of circumstances analysis, to this matter.

In determining whether bad faith exists to warrant denial of conversion, courts may consider both pre-petition and post-petition acts.[36]  Thus, a debtor's post-petition actions may combine with pre-petition actions to create a pattern of abuse exhibiting a debtor's attempts to stymie creditors without a desire to repay their claims.[37]  Successive bankruptcy filings do not always create bad faith in a case, but it may infer bad faith in light of other circumstances in the case.[38]

The Debtor argues that to show bad faith, the objecting parties must show some degree of *malum in se*.  The Court disagrees.  Bad faith is a term of art.  Its inquiry can be objective rather than subjective.[39]  Thus, a court may find that a debtor is attempting to convert a case in bad faith based on the totality of circumstances without specifically finding that the debtor's motivation is evil.  The Debtor argues that bad luck and bad decisions do not equate to bad faith.  The Court agrees in part.  Bad luck should not be the sole basis for a finding of bad faith.  But on the other

---

[35]In re Laguna Assoc. Ltd P'ship, 30 F.3d 734, 738 (6th Cir. 1994) (cited by In re Nursery Land Dev., Inc., 91 F.3d 1414, 1416 (10th Cir. 1996)).

[36]See In re Copper, 426 F.3d 810, 813 (6th Cir. 2005).

[37]Id.

[38]In re Young, 237 F.3d 1168, 1174 (10th Cir. 2001); In re Steinacher, 283 B.R. 768 (9th Cir. BAP 2002).

[39]Matter of Elmwood Development Co., 964 F.2d 508, 512 (5th Cir. 1992); In re Muskogee Environmental Conservation Co., 236 B.R. 57, 68 (Bankr. N.D. Okla. 1999).

hand, bad faith generally includes facts which show the a debtor made poor decisions.

At the hearing on this matter, the parties disputed whether the Debtor or the objecting parties have the burden of persuasion to show that the Debtor's Motion to Convert should be denied under Marrama.  After considering oral arguments on this issue, the Court determined that under Marrama, a debtor seeking to convert a case from chapter 7 has an initial burden to show that the debtor has not previously converted the case to chapter 7, and that the debtor is otherwise eligible to be a debtor under the new chapter (in this case, chapter 11).  Once the debtor establishes these requirements, the burden is placed on an objecting party to show that the debtor is attempting to convert the case in bad faith.  In this case, the parties do not dispute that the Debtor in this case has not previously converted this case and that the Debtor is otherwise eligible to be a chapter 11 debtor under § 109 of the Bankruptcy Code.  Thus, the Court should grant the Debtor's Motion to Convert unless the objecting parties can show that the Debtor's Motion is filed in bad faith under Marrama.

Under the circumstances of this case, the Court concludes that the objecting parties have carried their burden to show that the Debtor's attempt to convert this case to chapter 11 is made in bad faith.  Specifically, the Court believes the totality of circumstances in this case shows a pattern of abuse whereby the Debtor has stymied its major secured creditors, LIICOA and Barnes, without a significant intention of repaying creditors.

A.     **Impact of the Order of Substantive Consolidation**

Much of the conduct at issue in this matter relates to the events occurring in the chapter 11 Consolidated Estate.  The Debtor argues that these events are irrelevant in this matter because George Love Farming LC, the debtor in this case, was not a debtor in the chapter 11 case.

14

Counsel points out that although the assets and liabilities of George Love Farming LC were substantively consolidated with the bankruptcy estates of Mr. Love and Snowville Farms, LLC in the chapter 11, it never filed a bankruptcy petition before this case.

After reviewing the record in this case and in the chapter 11 case, the Court concludes that although George Love Farming LC was not originally a debtor in the chapter 11 case, it became a debtor as a result of the Court's Order of Substantive Consolidation.  When a court substantively consolidates bankruptcy estates, the effect is "to pierce the several corporate veils and to disregard the existence of the separate corporate entities."[40]  The result is the creation of "one common pool consisting of assets, liabilities and a single body of creditors, while extinguishing the intercorporate liabilities of the consolidated entities."[41]  Substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities."[42]  Thus, it has been said that substantive consolidation should be used sparingly because it is a tool "vitally affecting substantive rights."[43]

The Court determines that the Substantive Consolidation Order entered in the chapter 11 case had the desired effect — it substantively consolidated the estates and liabilities of Snowville Farms, LLC, George Love Farming LC, George Love Farming Partnership, George Love Family Partnership and George Love, creating a single debtor with a single set of assets and liabilities (the Consolidated Estate).  Thus, under the case law discussed above the logical conclusion in

---

[40]In re Gulfco Investment Corp., 593 F.2d 921, 928 (10th Cir. 1979); In re Bonham, 229 F.3d 750, 765-66 (9th Cir. 2000).

[41]In re Creditors Service Corp., 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996).

[42]In re Owens Corning, 419 F.3d 195, 205 (3d Cir. 2005).

[43]In re Flora Mir Candy Corp., 432 F.2d 1060, 1062 (2d Cir. 1970).

15

this case is that each debtor became an alter ego for the other as a result of the Consolidation

Order.  So when George Love Farming, LC filed this chapter 7 case, it did so as the alter ego of

the entire Consolidated Estate.  To that end, it appears that the present chapter 7 estate includes

all of the assets and liabilities of the Consolidated Estate because it includes all of the

Consolidated Entities.

        In the alternative, the Court concludes there is sufficient evidence in this case to

affirmatively apply the alter ego doctrine to the Debtor, George Love, and the Consolidated

Entities.  A court may disregard a corporate entity under the alter ego doctrine if: 1) there is a

unity of interest and ownership such that the separate personalities of the entities no longer exist;

and 2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an

inequity.[44]  The Court determines that these elements are present in this case.

        As discussed in the examiner's Initial Report, the separate personalities of each of the

Consolidated Entities no longer exists.  The examiner's findings as to the relationship between

Mr. Love and his various entities (including George Love Farming LC) are as relevant to this

case as they were in the chapter 11 case.  Also, the Court has seen first-hand how Mr. Love treats

George Love Farming LC and the other Consolidated Entities.  When it benefitted his interests,

he represented to the Court that the Dry Farm and the Sanda Rosa Farm were "fully subject to

the Trustee's legal ownership."[45]  The Court interprets this admission to mean that the estate

owns 100% of the farm properties.  When his interests shifted, however, he argued in opposition

---

[44]d'Elia v. Rice Development, Inc., 147 P.3d 515, 522 (Utah App. 2006).

[45]Notice of Debtor's Agreement as to Ownership of Property, George Love Farming LC, 06-20612 (Docket No. 40) (admitting that the chapter 7 Trustee has "legal ownership" of the Sanda Rosa Farm and the Dry Farm).

16

to the Trustee's Motion to Sell the Dry Farm that the Trustee held title to only 25% of the farm

properties.  Further, at the hearing on this matter, Mr. Love testified that George Love Farming

LC owns approximately $400,000 in cash.  When asked where the cash was located, he testified

that it was in the chapter 11 debtor in possession account.

The Court also believes that it would be unjust and inequitable to continue recognizing

the various separate corporate forms of each of the Consolidated Entities.  The administration of

this chapter 7 case has been delayed by Mr. Love's indecision as to whether George Love

Farming LC owns full title to the farm properties.  If the Court continued to respect the various

corporate forms of the Consolidated Entities, the Court believes there would be no end to the

confusion and delay caused by this indecision.  Further, LIICOA and Barnes are secured by the

farm properties but have been frustrated in their efforts to exercise their rights in this case and

the chapter 11 case because the Debtor continues to argue the distinction between the

Consolidated Estate and the current Debtor.  At the same time, Mr. Love continues to control the

properties (collateral for Barnes and LIICOA) as the purported principal for the Consolidated

Estate.  This is unfair and inequitable.

Based on the facts of this case, even if the Court had not previously entered its Order of

Substantive Consolidation, the Court finds that George Love Farming LC and the Consolidated

Entities are alter egos of each other and of Mr. Love himself.  Accordingly, the Court believes it

appropriate to consider the Consolidated Debtors' actions in the chapter 11 case to determine

whether it now seeks to convert this case in bad faith.

The Debtor argues that it is not bound by the statements and admissions contained in the

Notice of Debtor's Agreement as to Ownership of Property, even though it was filed and signed

17

by counsel for the Debtor.  Specifically, the Debtor argues that its counsel filed the Notice

without Mr. Love's authorization.  In the Tenth Circuit, clients are bound by the admissions and

statements of their counsel.[46]  Further, if the admissions and statements in the Notice exceeded

the scope of his authority, the Debtor should have brought its concern to the attention of the

Court promptly.  The Court is only hearing of the Debtor's disagreement with the statements in

the Notice now, ten months after it was filed.

The Debtor also argues that whatever impact the admissions in the Debtor's Notice may

have had, it was superceded by the Stipulated Judgment issued in the Trustee's adversary

proceeding.  In particular, the Debtor points out that whereas the Debtor's Notice contains the

Debtor's admission that the present chapter 7 estate holds full ownership in the Sanda Rosa

Farm, the Stipulated Judgment provides for distribution of sale proceeds to George Love,

Valayne Love, and Snowville Farms, LLC.  The Court has reviewed the Stipulated Judgment and

does not believe that the admissions or statements made by the Debtor in the Debtor's Notice

were withdrawn or abrogated.  The Stipulated Judgment does provide for a distribution of

proceeds from the sale of the Sanda Rosa Farm and reserves the Debtor's rights to object to a

future sale, but it does not impact admissions or statements made by the Debtor in the Debtor's

Notice.[47]

**B.      Circumstances of Bad Faith under Tenth Circuit Authority**

As discussed above, the Court should determine whether the Debtor seeks conversion in

---

[46]Frank v. Bloom, 634 F.2d 1245, 1521 (10th Cir. 1980).

[47]The Court also notes that the Stipulated Judgment did not purport to alter or amend the
Confirmed Plan of Reorganization in the Consolidated Estate, nor was notice of the Judgment
provided to creditors of the Consolidated Estate.

18

bad faith by using a totality of the circumstances analysis which includes the following:

1) whether the debtor has one asset;
2) whether the debtor's pre-petition conduct has been improper;
3) whether there are only a few unsecured creditors;
4) whether the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
5) whether the debtor and one creditor have proceeded to a standstill in a prior forum, and the debtor has lost;
6) whether the filing of the petition effectively allows the debtor to evade court orders;
7) whether the debtor has no ongoing business or employees; and
8) whether there is a lack of possibility for reorganization.[48]

### 1.  Whether the Debtor Has Few Significant Assets

At the time of filing this case, the Debtor had two significant assets — an interest in the Dry Farm and the Sanda Rosa Farm. Regardless of whether the Debtor owns a full fee simple interest in the farms or only a 25% interest, this case boils down to two major assets. This fact suggests that the Debtor is attempting to convert this case in bad faith.

### 2.  The Debtor's Conduct Pre and Post Petition

The Court believes the Debtor's conduct in the course of this case and during its participation in the chapter 11 case exhibits an intent to manipulate its major secured creditors with the sole motivation of retaining its property at any cost. The Court confirmed a plan of reorganization in the chapter 11 case (which included George Love Farming LC) on November 16, 2006. Soon after substantial consummation of the plan, however, the Consolidated Debtors breached the plan by failing to make the first payments owing to Barnes Bank and LIICOA, two of the major secured creditors in that case. When LIICOA and Barnes sought to exercise their

---

[48]In re Laguna Assoc. Ltd P'ship, 30 F.3d 734, 738 (6th Cir. 1994) (cited by In re Nursery Land Dev., Inc., 91 F.3d 1414, 1416 (10th Cir. 1996)).

19

rights under the plan of reorganization by scheduling foreclosure sales on the Dry Farm and the

Sanda Rosa Farm, the Consolidated Debtors filed numerous motions to stop the foreclosure.

Over the span of a month, the Consolidated Debtors filed and the Court denied a Motion to

Modify the Plan of Reorganization, a Motion to Enforce the Plan of Reorganization, a Motion to

Convert the case to Chapter 7, and a Motion for Preliminary Injunction.  At the hearings on each

of these Motions, the Consolidated Debtors argued that their primary motivation was to pay all

creditors of the estate rather than just LIICOA.

 The Debtor's actions in the present chapter 7 case exhibit a different motivation,

however.  In objecting to LIICOA's Motion for Relief in this case, the chapter 7 Debtor filed the

Debtor's  Notice, wherein the Debtor agreed that the chapter 7 Trustee had full legal ownership

of the Dry Farm and the Sanda Rosa Farm.  Less than two months later, however, the Debtor

objected to the Trustee's proposed sale of the Dry Farm because it argued that the chapter 7

estate held only a 25% interest in the farm, and promptly filed a Motion to Convert to Chapter

12.

 When the Trustee filed a Motion to Sell the Sanda Rosa Farm, the Debtor's principal

(George Love) caused a breach of the Trustee's Real Estate Purchase Contract by trading away

farm property and relocating pivots which were integral to the sale contract.  When the Trustee

filed a Motion to hold George Love in Contempt, the Debtor filed the present Motion to Convert

to Chapter 11.

 Taken as a whole, the Court does not believe the Debtor is motivated by a desire to pay

creditors.  It appears to the Court that the Debtor desires to retain its farm property at any cost,

regardless of whether its actions negatively or unfairly impact creditors.  To that end, the Court

20

does not believe the Debtor's conduct throughout this case and the chapter 11 case has been proper.

      3.    <u>Whether there are Several Creditors in this Case</u>:

There are at least 19 proofs of claim filed in this case. That said, the filing of this case really represents the Debtor's dispute with two major creditors — LIICOA and Barnes Bank. The Debtor filed this case to stop foreclosure sales scheduled by LIICOA and Barnes under the terms of its chapter 11 plan in the chapter 11 case. LIICOA and Barnes have been the only creditors regularly appearing for hearings in this matter. Thus, the Court believes this consideration is neutral.

      4.    <u>Whether the Filing of this Case Followed an attempted Foreclosure and whether the Debtor was Successful in Defending against the Creditor Pre-Petition</u>:

This factor suggests that the Debtor is attempting to convert this case in bad faith. The Debtor filed this case to stop foreclosure sales scheduled by LIICOA and Barnes Bank under the default provisions of the Debtor's confirmed chapter 11 plan in the Consolidated Case. Further, this case was filed only after the Debtor was unsuccessful in avoiding foreclosure through numerous other motions and hearings in the chapter 11 case. In essence, this case represents the Debtor's fifth "bite at the apple" in its attempt to avoid foreclosure.

      5.    <u>Whether the Debtor and a Creditor Proceeded to a Standstill in a prior forum and the Debtor Lost</u>:

This factor also suggests that the Debtor is attempting to convert this case in bad faith. As discussed above, the Court held four separate hearings on various motions filed by the Debtor in the chapter 11 case in an attempt to avoid foreclosure. The Debtor was unsuccessful on each of these motions. The Debtor had exhausted its litigation options in the Consolidated Estate.

21

Practically speaking, the Debtor was at a standstill in its fight against LIICOA and Barnes Bank.

Filing this case was the only option remaining to the Debtor to stop LIICOA's foreclosure sale.

> 6.   Whether the Filing of this Case Effectively Allowed the Debtor to Evade
>       Court Orders:

This factor suggests the Debtor is attempting to convert this case in bad faith.  The

Court's Order Confirming the Debtor's Plan of Reorganization in the chapter 11 case covered

both the Debtor's payment schedule as well as the default provisions should the Debtor default

on those payments.  By filing this case, the Debtor deprived LIICOA and Barnes Bank of their

vested and negotiated rights under the confirmed plan.

As an additional consideration, the Court notes that Mr. Love, the Debtor's principal, has

a history of ignoring the automatic stay and Court orders.  Mr. Love's unilateral decision to

excavate and trade away three miles of PVC pipe from the Sanda Rosa Farm and move five

pivots on the property despite his knowledge of the Trustee's Motion to Sell the property and

without permission from the Trustee, LIICOA, or the Court is only one example of the cavalier

manner in which Mr. Love treats property of the estate.  At the hearing on the Trustee's Motion

for Contempt, the Court also heard testimony that Mr. Love liquidated cattle in which the estate

had an interest despite the Trustee's specific instructions to the contrary.  Mr. Love argues that

he had the Trustee's permission to liquidate the cattle.

Further, LIICOA points out that the Debtor and its principal, Mr. Love, have a history of

evading the Court's orders in the Chapter 11 case as well.  LIICOA argues that "the

Consolidated Estate had to be ordered to maintain insurance on the farm properties, had to be

prohibited by Court order from making unauthorized transfers to non-debtor parties, consistently

filed late operating reports, and defaulted on their responsibilities to pay Barnes and LIICOA

under the confirmed plan."[49]  Although the evidence on each of these allegations was not as

strong as LIICOA suggests, the Court agrees with LIICOA that the Debtor's overall prior

conduct in the chapter 11 case suggests that the Debtor and its principal have a tendency to not

take Court orders seriously.  This further persuades the Court that the Debtor's attempt to

convert this case is made in bad faith.

7.    Whether the Debtor has an Ongoing Business or Employees:

Whereas the Debtor has continued to operate the farming business after filing this case,

the Court found in connection with the Trustee's Motion for Contempt that this operation was a

violation of the automatic stay and held that the farming operations must stop.  As of the date of

this Memorandum Decision, the Court has not authorized the operation of the Debtor's business

under § 721 of the Bankruptcy Code.[50]  The fact that the Debtor has continued to operate the

farm business without permission from the Court does not indicate good faith.

8.    Whether there is a Lack of Possibility for Reorganization:

The Court does not believe it likely that the Debtor could successfully reorganize if

allowed to convert to chapter 11.  The Debtor had a substantial opportunity to reorganize in the

chapter 11 case and defaulted before making its first few payments owing under the plan.  It is

difficult to see how the result would be different in another chapter 11 case.

At the hearing on this matter, Mr. Love testified that the only cash available to the Debtor

---

[49]LIICOA's Objection to Debtor's Motion to Convert to Chapter 11 at ¶ 38.

[50]At the conclusion of the hearing on the Trustee's Motion for Contempt, the Court did
authorize the Trustee to operate the farm business in a very limited capacity to allow the
completion of the project relating to removing the pipe and moving the pivots.  The Court
specifically stated that it was granting the Trustee limited permission only, and that no other
farm operations were authorized without further permission from the Court under § 721.

are funds in the chapter 11 Consolidated Estate's debtor in possession account.  He testified that

if this case were converted to chapter 11, it would likely be funded by a gift made by one of his

other non-debtor companies.  In light of this testimony, the U.S. Trustee and LIICOA argue that

the Debtor has not provided a sufficient basis to explain how it plans to reorganize with the

Sanda Rosa property only.

The Court is persuaded that if the Debtor could not successfully reorganize with both

farm properties in the Consolidated Estate, it is unlikely the Debtor could reorganize now with

only the Sanda Rosa property and fewer funds on hand.

9.    Motivation and Sincerity of the Debtor:

In addition to the eight factors discussed above, the Court also believes that the Debtor's

stated motivation and sincerity in seeking to convert this case is relevant to whether conversion

is sought in bad faith.  At the hearing on this matter, the Debtor argued and Mr. Love testified

that its sole motivation in converting this case is to obtain a greater return for unsecured

creditors.  Mr. Love testified that he believes the chapter 7 Trustee's Motion to Sell the Sanda

Rosa Farm proposes to sell the property for an insufficient amount.  He further testified that he

believes he can obtain a greater return for unsecured creditors by operating the farm business and

possibly selling smaller parcels of the Sanda Rosa Farm.  This testimony is similar to the

Debtor's reason for filing this chapter 7 case last year, where he argued against dismissal at the

hearing on LIICOA's Motion to Dismiss on March 13, 2006.  In responding to LIICOA's

Motion to Dismiss, the Debtor argued that its sole motivation in filing for chapter 7 relief was to

avoid foreclosure and obtain an orderly distribution to all creditors of the estate.[51]  There too, Mr.

---

[51]Objection to Motion to Dismiss and Motion for Relief from Stay, Docket No. 9.

24

Love testified that his sole motivation in filing this case was to repay his creditors.  Indeed,

counsel for the Debtor stated at the hearing on LIICOA's Motion to Dismiss that "[t]he purpose

is completely different from a Chapter 11 and it's basically an admission that the property needs

to be liquidated in favor of all creditors."[52]

The Court does not believe that the Debtor's true motivation in seeking to convert this

case is to repay creditors.  When the Debtor filed for chapter 7 relief, it stated that its main goal

was to obtain the benefits of a chapter 7 Trustee.  Now that the Trustee is doing his job and

liquidating assets of the estate, the Debtor is seeking to convert this case to chapter 11.  The

stated motivation for seeking to convert at this time does not seem genuine to the Court.  Further,

the Court does not believe Mr. Love to be a credible witness.  He often does not answer

questions directly and his memory of major events in this case changes depending on the matter

at hand.  At times, he did not recall details relating to significant events in this case but he did

remember specific details regarding numbers and other minutia.

The Debtor argues that the Court should not give credence to the arguments made by the

chapter 7 Trustee.  Specifically, the Debtor argued that the chapter 7 Trustee is motivated by a

desire to obtain payment for selling the Sanda Rosa Farm.  The Debtor argues that it is the only

party attempting to protect unsecured creditors in this case because the sale proposed by the

Trustee for the Sanda Rosa Farm would not provide a return for unsecured creditors.  To the

contrary, the Court finds the Trustee's opposition to the Motion to Convert persuasive in this

case.  Chapter 7 Trustees are tasked with a host of responsibilities which include the

investigation of the financial affairs of the debtor, opposing a debtor's discharge if advisable, and

---

[52]Transcript of Oral Argument at 34, March 13, 2006 (Creditor's Exhibit 3).

making distributions to creditors under a final report.[53]  In conducting these responsibilities, a

chapter 7 Trustee is also considered a representative of the interests of creditors.[54]  In light of all

these responsibilities, the Trustee cannot be said to act in his own personal interests simply

because he advocates a sale which would not pay unsecured creditors.  In addition, the Court

notes that there are other assets aside from the farm properties which could be liquidated by the

Trustee to pay unsecured creditors in this case.  His objection to the Motion to Convert appears

entirely appropriate to the Court and the Trustee's concerns should be taken seriously absent a

clear showing of abuse of discretion.[55]

In light of the above nine factors and the totality of circumstances in this case, the Court

determines that the Debtor is attempting to convert the case to chapter 11 in bad faith.  The

totality of circumstances indicates a pattern of behavior whereby the Debtor has manipulated the

provisions of the Bankruptcy Code and hindered the rights of its principal secured creditors in an

effort to retain its farming property at any cost.  Further, the Court does not believe the Debtor is

likely to be successful in another chapter 11 case when it was unsuccessful in the former chapter

11 case and with Mr. Love acting as its principal.  Converting this case to chapter 11 is likely to

further hinder and delay creditors and would halt the Trustee's attempt to sell property of the

estate.  The Court specifically finds that this Debtor is the "atypical" debtor discussed in

Marrama. Accordingly, the Court elects to exercise its discretion under § 105(a) and Marrama to

deny the Debtor's Motion to Convert to chapter 11.

---

[53]See 11 U.S.C.A. § 704(a).

[54]Koch Refining v. Farmers Union Cent. Exchange, Inc., 831 F.2d 1339, 1342-43 (7th Cir. 1987).

[55]See In re Curlew Valley Assoc., 14 B.R. 506 (Bankr. D. Utah 1981).

26

IV.      **CONCLUSION**

The Debtor's Motion to Convert to Chapter 11 should be denied.  A separate Order
accompanies this Memorandum Decision.



Service of the foregoing **MEMORANDUM DECISION DENYING DEBTOR'S MOTION TO CONVERT** will be effected through the Bankruptcy Noticing Center to each party listed below.

All parties listed on the mailing matrix in this case.

All parties listed on the mailing matrix in Bankruptcy Case No. 04-36559.

Joel Marker
Jeremy Sink
McKay Burton & Thurman
170 South Main Street, Suite 800
Salt Lake City, UT 84101

Cy Castle
Peter Kuhn
U.S. Trustees Office
Ken Garff Building
405 South Main Street, Suite 300
Salt Lake City, UT 84111

M. Robert Smith
31 Federal Avenue
Logan, UT 84321

Paul Toscano
Boston Building, Suite 419
9 Exchange Place
Salt Lake City, UT 84111

Russell Walker
Woodbury & Kesler
265 East 100 South, Suite 300
P.O. Box 3358
Salt Lake City, UT 84110-3358

Kim Wilson
Snow, Christensen & Martineau
10 Exchange Place, 11th Floor
P.O. Box 45000
Salt Lake City, UT 84145

Gary Jubber
Fabian & Clendenin
215 South State Street
12th Floor
P.O. Box 510210
Salt Lake City, UT 84151

Danny Kelly
Brandy Sargent
Stoel Rives
201 South Main Street, Suite 1100
Salt Lake City, UT 84111

28